No. 01-14-00892-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TX
January 21, 2015
CHRISTOPHER A. PRINE,
CLERK

In the Court of Appeals
for the First Judicial District
Houston, Texas

---

ADELAIDA SALAZAR BAUTISTA A/K/A ADELAIDA ALVARADO,
INDIVIDUALLY AND AS NEXT FRIEND OF MARIA JENNIFER AIDE
A/K/A MARIA JENNIFER ALVARADO, A. A. A. A., I. S. A., M. A., AND E.
A., MINORS; AND IRINEO ALVARADO AND MARIA ANA MOCTEZUMA,

Appellants,

v.

TRINIDAD DRILLING LIMITED,

Appellee.

---

On Appeal from the
270th Judicial District Court of Harris County

---

## BRIEF OF APPELLANTS

---

Respectfully submitted,

By  */s/ Geoffrey E. Schorr*
    Geoffrey E. Schorr
    geoff@schorrfirm.com
    Texas Bar No. 24029828
    A. Jared Aldinger
    Texas Bar No. 24068456
    jared@schorrfirm.com
    SCHORR LAW FIRM, PC

328 W. Interstate 30, Suite 2
Garland, TX 75043
Tel. (972) 226-8860
Fax (972) 226-9787

Hutton W. Sentell
Texas Bar No. 24026655
hsentell@ashmorelaw.com
ASHMORE LAW FIRM, P.C.
3636 Maple Ave.
Dallas, TX 75219
Tel. (214) 559-7202
Fax (214) 520-1550

Andrew P. McCormick
Texas Bar No. 3457100
amccormick@mlm-lawfirm.com
McCORMICK, LANZA & McNEEL, LLP
4950 Bissonnet Street
Bellaire, TX 77401
Tel. (713) 523-0400
Fax (713) 523-0408
ATTORNEYS FOR
PLAINTIFFS/APPELLANTS ADELAIDA
SALAZAR BAUTISTA a/k/a  ADELAIDA
ALVARADO, Individually, and as next
friend of MARIA JENNIFER AIDE a/k/a
MARIA JENNIFER ALVARADO,
AURELIA ALVARADO, ALEJANDRA
ALVARADO, IVAN SALAZAR
ALVARADO, MARIAN ALVARADO, and
EDUARDO ALVARADO, Minors

And

By: */s/ Justin K. Hall*
    Justin K. Hall
    Texas Bar No. 90001828
    jkhall@justinkhall.com
    328 W Interstate 30, Suite 2

Garland, Texas 75043
Tel. (972) 226-1999
Fax (972) 226-2221
Attorney for Plaintiffs, Irineo Alvarado and
Maria Ana Moctezuma

ORAL ARGUMENT REQUESTED

# INDEX OF PARTIES AND COUNSEL

1. Appellants:

    a. Adelaida Salazar Bautista a/k/a Adelaida Alvarado, Individually, and as next friend of Maria Jennifer Aide a/k/a Maria Jennifer Alvarado, Aurelia Alvarado, Alejandra Alvarado, Ivan Salazar Alvarado, Marian Alvarado and Eduardo Alvarado, Minors

        Represented by:

        > Geoffrey E. Schorr
        > geoff@schorrfirm.com
        > Texas Bar No. 24029828
        > A. Jared Aldinger
        > Texas Bar No. 24068456
        > jared@schorrfirm.com
        > SCHORR LAW FIRM, PC
        > 328 W. Interstate 30, Suite 2
        > Garland, TX 75043
        > Tel. (972) 226-8860
        > Fax (972) 226-9787

        > Andrew P. McCormick
        > Texas Bar No. 3457100
        > amccormick@mlm-lawfirm.com
        > McCORMICK, LANZA & McNEEL, LLP
        > 4950 Bissonnet Street
        > Bellaire, TX 77401
        > Tel. (713) 523-0400
        > Fax (713) 523-0408

    b. Irineo Alvarado and Maria Ana Moctezuma

        Represented by:

        > Justin K. Hall
        > Texas Bar No. 90001828
        > jkhall@justinkhall.com

The Law Offices of Justin K. Hall, P.C.
328 W Interstate 30, Suite 2
Garland, Texas  75043
Tel. (972) 226-1999
Fax  (972) 226-2221

Andrew P. McCormick
Texas Bar No. 3457100
amccormick@mlm-lawfirm.com
McCORMICK, LANZA & McNEEL, LLP
4950 Bissonnet Street
Bellaire, TX 77401
Tel. (713) 523-0400
Fax (713) 523-0408

2.  Appellee:

Trinidad Drilling, Ltd.

Represented by:

Michael Beckelman
Texas Bar No. 24042401
michael.beckelman@wilsonelser.com
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
909 Fannin Street, Ste. 3300
Houston, TX 77010
Tel. (713) 353-2000
Fax (713) 785-7780

# TABLE OF CONTENTS

**INDEX OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .VIII

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .X

**STATEMENT REGARDING ORAL ARGUMENT** . . . . . . .. . . . . . . . . .XI

**ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .XII

**BRIEF**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    *I.*     *Summary of Argument*..........................................................*1*

    *II.*    *Statement of Facts*...........................................................*2*

    *III.*   *Applicable legal standards*..............................................*8*

    *IV.*   *As a preliminary matter, this Court should apply a de novo review to factual issues, with inferences drawn in favor of jurisdiction.*............*10*

    *V.*    *Trinidad Limited is subject to specific jurisdiction based on its own acts.* ........................................................................................*13*

      A.   As a preliminary matter, there is no dispute that Plaintiffs have pled tort claims based on Trinidad Limited's own actions. ..................................14

      B.   The evidence and uncontroverted allegations show Trinidad Limited set operational policies and exercised operational control over Trinidad L.P.'s drilling operations in Texas........................................................16

          1. The *uncontroverted allegations* show that Trinidad Limited exercised operational control and set operational policies for Trinidad L.P........................................................................................................16

          2. Even if Plaintiffs' allegations had been controverted, the great weight of evidence demonstrates that Trinidad Limited retained the right to control, and set operational policies for, drilling operations. ...18

      C.   Trinidad Limited knew and intended that its control would extend to drilling operations in Texas and that Texas residents would bear the risk of any negligent policies or control. ....................................................24

D.   Therefore, Trinidad Limited is subject to specific jurisdiction, as it could "reasonably anticipate being haled into Court" in Texas and the exercise of jurisdiction would not offend fair play and substantial justice. ...................................................................................27

*VI.*   ***Trinidad Limited is also subject to general jurisdiction based on its own acts.*** *...................................................................................30*

*VII.*   ***Prayer****...................................................................................34*

**CERTIFICATE OF COMPLIANCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

**CERTIFICATE OF SERVICE.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

# INDEX OF AUTHORITIES

**Authority**                                                                  **Page(s)**

*As-ahi A1etal Industries Co. v. Superior Court,* 480 U.S. 102 (1987) 29

*Assurances Generales Banque Nationale v. Dhalla,*
282 S.W.3d 688 (Tex. App.—Dallas 2009, no pet.) 8

*BMC Software Belgium, N.V. v. Marchand,*
83 S.W.3d 789 (Tex. 2002) 11

*Buchanan v. Rose*, 159 S.W.2d 109 (Tex. 1942) 14

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985) 9, 28, 30, 33

*Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981) 14

*Design Info. Sys. v. Feith Sys. & Software, Inc.,* 801 S.W.2d
569 (Tex. App.—Fort Worth 1990, no writ), *rev'd in
part on other grounds,* 813 S.W.2d 481 (Tex. 1991) 31

*El Chico Corp. v. Poole*, 732 S.W.2d 306 (Tex. 1987) 14

*Fox v. Dallas Hotel Co.*, 240 S.W. 517 (1922) 14

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays*,
815 S.W.2d 223 (Tex. 1991) 25, 29

*Guidry v. U.S. Tobacco Co., Inc.,* 188 F.3d 619 (5th Cir. 1999) 10, 11, 28

*Helicopteros Nationales de Columbia, S.A. v. Hall,*
466 U.S. 408 (1984) 9, 28

*Internat'l Shoe Co. v. Washington,* 326 U.S. 310 (1945) 9, 24, 27

*Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653 (Tex. 2010) 11

*Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569 (Tex. 2007) 10

*Moncrief Oil Int'l Inc. v. OAO Gazprom,*
　　414 S.W.3d 142 (Tex. 2013) .................................... 12, 13

*Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769 (Tex. 1995) ......... 8,　10,　11,
　　13, 27

*Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277 (Tex.
　　App.—Houston [14th Dist.] 2009, no pet.) .................... 15, 17

*Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307 (Tex. 1983) .................. 14

*PHC-Minden, L. P. v. Kimberly Clark, Corp.,* 235 S.W.3d 163
　　(Tex. 2007) ................................................... 21, 22

*Retamco Operating, Inc. v. Republic Drilling Co.*,
　　278 S.W.3d 333 (Tex. 2009) ..................................... 8

*Schlobohm v. Schapiro*, 784 S.W.2d 355 (Tex. 1990) .................... 30

*Temperature Sys., Inc. v. Bill Pepper, Inc.,* 854 S.W.2d 669
　　(Tex. App. –Dallas 1993, writ dism'd by agr.) ................ 30

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,
　　No. 01 CIV. 3016(AGS)(HB), 2002 WL 1835439,
　　(S.D.N.Y. 2002) ............................................... 33

*Wellness Wireless, Inc. v. Vita*, *No. 01–12–00500–CV.,*
　　2013 WL 978270, (Tex. App.—Houston
　　[1 Dist.] 2013, no pet.) ...................................... 12

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) ...... 9, 28

## STATEMENT OF THE CASE

*Nature of the Case*     This action arose from an incident connected with a drilling rig, which resulted in the death of Nabor Alvarado. At the time of the incident, Nabor Alvarado was working on the rig for his employer, Trinidad Drilling Limited Partnership ("Trinidad L.P."). Plaintiffs/Appellants ("Plaintiffs") are Nabor Alvarado's surviving relatives, and they have brought suit against several defendants. In particular, Plaintiffs have asserted claims against Trinidad Drilling Ltd. ("Trinidad Limited"), based on Trinidad Limited's own negligence and gross negligence in controlling aspects of Trinidad L.P.'s drilling operations. Trinidad Limited contends it is not subject to personal jurisdiction, which is the issue now before this Court.

*Course of Proceedings*     Appellants filed suit against multiple entities, including Appellee, a Canadian based company, in connection with the death of Nabor Alvarado. Appellants contend that Appellee was subject to the jurisdiction of Texas Courts based on its contacts with Texas. After being served with the lawsuit, Appellee filed a special appearance challenging the Trial Court's jurisdiction. After a hearing, the Trial Court sustained the special appearance. The Appellants now appeal the Trial Court's ruling on the special appearance.

*Trial Court*     The Honorable Brent Gamble, 270th Judicial District Court, Harris County, Texas

*Trial Court Disposition*     The trial court sustained Trinidad Drilling's Amended Special Appearance, without making findings of fact or conclusions of law.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument if it will aid the Court in its decisional process.

# ISSUES PRESENTED

Whether the trial court erred by granting Defendant/Appellee's special appearance:

A. As a preliminary matter, is the Court required to defer to the trial court's ruling on factual issues, where the trial court *sustained* the special appearance and did so on a "cold record"?

B. Is Trinidad Drilling Ltd. subject to specific jurisdiction?

C. Is Trinidad Drilling Ltd. subject to general jurisdiction?

No. 01-14-00892-CV

In the Court of Appeals
for the First Judicial District
Houston, Texas

---

ADELAIDA SALAZAR BAUTISTA A/K/A ADELAIDA ALVARADO,
INDIVIDUALLY AND AS NEXT FRIEND OF MARIA JENNIFER AIDE
A/K/A MARIA JENNIFER ALVARADO, A. A. A. A., I. S. A., M. A., AND E.
A., MINORS; AND IRINEO ALVARADO AND MARIA ANA MOCTEZUMA,

Appellants,

v.

TRINIDAD DRILLING LIMITED,

Appellee.

---

On Appeal from the
270th Judicial District Court of Harris County

---

**BRIEF OF APPELLANTS**

---

## I.     Summary of Argument

This appeal involves a special appearance by Trinidad Drilling Ltd., in a

wrongful-death and survival action regarding the death of Nabor Alvarado.  Nabor

Alvarado's surviving relatives have alleged that Trinidad Drilling Ltd. controlled

aspects, including the safety aspects, of the drilling operations that resulted in

Nabor Alvarado's death.  Moreover, they have alleged that Trinidad Drilling Ltd.

was negligent and grossly negligent in exercising such control, given that it was aware of five previous incidents of the type that resulted in Nabor Alvarado's death.

The trial court sustained Trinidad Drilling Ltd.'s special appearance and dismissed it for lack of personal jurisdiction. However, the trial court was in error, as the undisputed allegations and the great weight and preponderance of evidence show that Trinidad Drilling Ltd. is subject to both specific and general jurisdiction.

As discussed in Section V:

1. Trinidad Drilling Ltd. exercised control over, set policies for, and took responsibility for aspects of drilling operations in Texas, *see supra,* Section V(B);

2. Trinidad Limited knew and intended that the drilling operations would be conducted in Texas, and that its control and policy-setting would therefore extend to Texas operations, *see supra,* Section V(C); and

3. Plaintiff has alleged that Trinidad Limited was negligent in exercising control and setting policies, and Plaintiff's claims arise from such negligence, *see supra,* Section V(A).

Therefore, Trinidad Drilling Ltd. is subject to specific jurisdiction in this case. Moreover, as discussed in Section IV, the evidence is also sufficient to establish general jurisdiction. Therefore, the trial court should be reversed, and this action should be remanded for a trial on the merits.

## II. Statement of Facts

This action arises from an incident that occurred on or about July 13, 2010, which resulted in the death of Nabor Alvarado. C.R.35 ¶ 3.01. At the time of the

incident, Nabor Alvarado was helping install guide beams on a drilling rig—Rig # 130—for his employer, Trinidad Drilling Limited Partnership ("Trinidad L.P."). *See* C.R.35 ¶¶ 3.01-3.02.[1] Plaintiffs/Appellants ("Plaintiffs") are Nabor Alvarado's surviving relatives, including his minor children. *See* C.R.33 ¶¶ 1.01-1.02. They have brought suit against several defendants, including Trinidad L.P.'s parent company, Trinidad Drilling Ltd. ("Trinidad Limited"), which is the Appellee on this appeal. *See* C.R.33 ¶¶ 1.03-1.09. The claims against Trinidad Limited are not made on any alter-ego or similar veil-piercing theory; rather, Plaintiff asserts claims against Trinidad Limited for its *own* alleged acts and omissions. *See, e.g.* C.R.38-40 ¶¶ 4.01-4.13.

More specifically, Plaintiffs have alleged: that Trinidad Limited exercised control over, and set policies for, aspects of Trinidad L.P.'s drilling operations; that Trinidad Limited did so negligently; and that such negligence caused Plaintiffs' injuries. *See* C.R.35 ¶ 3.03; C.R.38-40 ¶¶ 4.01-4.13. Of particular note, Plaintiffs have alleged that Trinidad Limited was aware of at least five prior, documented accidents similar to the one causing Nabor Alvarado's death. C.R.38 ¶¶ 4.08-4.09. The relevant portions of Plaintiffs' live pleading (the Third Amended Petition) are as follows:

---

[1] In this brief, the Original Clerk's Record is cited as "C.R." The 1st Supplemental Clerk's Record is cited as "Supp. C.R."

3.01 This action arises from an incident occurring on or about July 13, 2010, that resulted in the death of Nabor Alvarado. At the time of the incident, Nabor Alvarado was helping install the National Oil Well Varco guide beams on the drilling rig that would serve as the torque track for the top drive system for Rig #130. Rig #130, manufactured by VREC, had recently been moved to a new drilling site at 5700 US Hwy 287, Arlington, Tarrant County, Texas, also known as the Yorn 1-H Lease, and was in the process of being rigged up to drill for gas. While in the process of putting together and hanging the National Oil Well Varco top drive guide beam track using the track carrier, based upon information and belief, the top of the first section of track caught and hung on the back side of the VREC derrick. Following the derrick strike, the traveling block continued pulling the track carrier upwards ripping a wire rope in half, causing the track carrier, also known as the Rig Up Down cart, to suddenly and unexpectedly fall back down to the rig floor, striking, pinning, impaling and killing Nabor Alvarado.

3.02 On the date of the incident Nabor Alvarado was working on the gas well rig in Tarrant County in the course and scope of his employment with TRINIDAD LP.

3.03 TRINIDAD LIMITED is the parent company of TRINIDAD LP, and it directs, controls and supervises the HSE (Health, Safety and Environment) of the drilling operations of TRINIDAD, LP, and investigates, creates and issues policy manuals and procedures for TRINIDAD, LP. TRINIDAD LIMITED had knowledge of 5 previously documented derrick strikes of the same manner that resulted in Nabor's death and its actions in taking remedial measures demonstrate its ownership and control of the operations and activities that resulted in Nabor's death. Although it had knowledge of the dangerous operations, activities and conditions relating to derrick strikes, TRINIDAD LIMITED did not make changes to policies and/or procedures regarding preventing derrick strikes until after Nabor's death.

. . .

4.07 At all relevant times Defendant TRINIDAD LIMITED was the parent company to TRINIDAD, LP, and exercised ownership, control and took responsibility for overseeing safety policies and procedures for the crews on the drilling rigs.

4.08 Based on information and belief, prior to Nabor's tragic and untimely death, TRINIDAD LIMITED had actual knowledge of 5 documented incidences of derrick strikes of the same manner as the one that killed Nabor. In fact, one of TRINIDAD LIMITED's employees wrote an email about the previous documented incidences to an employee of NOV. Inexplicably, TRINIDAD LIMITED failed to implement new policies and procedures to try and correct and/or prevent the type of derrick strike that resulted in Nabor's death until after he died.

4.09 Defendant TRINIDAD LIMITED and its agents, servants and/or employees, by assuming ownership, control and responsibility for safe drilling practices in Texas, were negligent in failing to properly oversee, instruct, train and/or supervise the safe operation of rigging up the drilling rig. Because of the 5 previous documented incidences of derrick strikes, Defendant TRINIDAD LIMITED was well aware of the need for training, oversight and supervision in the safe installation of the drilling rig, top drive, and guide beam track and to otherwise provide a safe environment to prevent just the type of catastrophic failure that injured and killed Nabor Alvarado, and by its actions and/or inactions exposed Nabor Alvarado to the threat of serious or fatal injury, and thereby acted without proper regard for the safety of Nabor Alvarado.

4.10 The injuries and damages sustained by [Plaintiffs] were proximately caused by the negligence of Defendant TRINIDAD LIMITED and its agents, servants and/or employees including, but not limited to, the following acts or omissions:

1. Defendant TRINIDAD LIMITED failed to provide a safe environment, and took incomplete or improper action to inspect for hazardous/dangerous conditions and did not warn of any such conditions;

2. Defendant TRINIDAD LIMITED knew that Nabor Alvarado would be exposed to a serious risk of injury and had a duty to protect Nabor Alvarado, but failed to do so;

3. Defendant TRINIDAD LIMITED failed to supervise and/or ensure proper training and/or procedures were followed in

rigging up of the National Oilwell Varco guide beam track system and top drive equipment; and

4. Defendant TRINIDAD LIMITED failed to create and implement new policies and procedures after having knowledge of 5 prior documented incidences of derrick strikes of the same manner that resulted in near misses.

4.11 Each of the above acts of negligence was a proximate cause of the injuries and damages sustained by Nabor Alvarado and Plaintiffs .
. . .

4.12 Additionally, Defendant TRINIDAD LIMITED and its agents, servants and/or employees were grossly negligent in failing to provide Nabor Alvarado and others with proper instruction, training and supervision, which control was retained by TRINIDAD LIMITED.

4.13 As such, TRINIDAD LIMITED displayed such an entire want of care that its actions were the result of conscious indifference to the rights, safety, and welfare of Nabor Alvarado. Such gross negligence was a proximate cause of the injuries and damages sustained by Nabor Alvarado, deceased, and Plaintiffs . . ., and pursuant to the provisions of Chapter 41 of the Texas Civil Practice and Remedies Code, Defendant TRINIDAD LIMITED is liable for exemplary damages.

C.R.35-36; C.R.38-40.

In its Amended Special appearance, Trinidad Limited purported to show that it was not subject to jurisdiction in Texas, focusing primarily on arguments involving corporate veil piercing. C.R.14-24. However, it did not do so.

The Amended Special Appearance was not verified; instead it was supported by an affidavit that only attested to the facts in such affidavit. C.R.28 ¶ 1. In turn, Trinidad Limited's affidavit did *not* controvert Plaintiffs' allegations regarding negligent control of drilling operations in Texas. *See, e.g., infra,* Section V(B)(1).

Indeed, the affidavit did not contain any testimony concerning control or policies at the time of the accident. *See id.* Although Trinidad Limited subsequently filed a second affidavit before the special-appearance hearing, that affidavit likewise did not controvert Plaintiffs' key allegations. *See* Supp. C.R.353-358. The hearing was non-evidentiary.

In addition to their uncontroverted allegations, Plaintiff produced additional evidence showing Trinidad Limited's contacts with Texas, including evidence showing that:

- Trinidad Limited's "General Manager of Corporate HSE" maintained a physical office in Texas, *see, e.g.* C.R.79;

- Trinidad Limited maintained control over aspects of Trinidad L.P.'s drilling operations, as evidenced by a subsequent remedial plan applicable to all of Trinidad Limited's operations, both in the U.S. and Canada, *see, e.g.,* C.R.80;

- Trinidad Limited's employees and officers made 126 trips to Texas to create and control Trinidad L.P.'s operations in the years leading up to incident, *see, e.g.,* Supp. C.R.115;

- Trinidad Limited bought, or at least financed, the drilling rig that resulted in Nabor Alvarado's death, for the express purpose to have such rig be used in operations in Texas, *see* C.R.51; C.R.65-66; C.R.81, Supp. C.R.356 ¶ 24.; Supp. C.R.444; and

- Trinidad Limited's annual reports have consistently and publicly identified "Wells Fargo, N.A." in "Houston, Texas" as the "banker" for "Trinidad Drilling Ltd.," *see, e.g.* Supp. C.R.237.

Despite the uncontroverted allegations and the evidence produced by Plaintiffs, the Court sustained Trinidad Limited's special appearance. *See* C.R.128-129. Plaintiff then appealed to this Court.

## III. Applicable legal standards

Under the Texas long-arm statute, the plaintiff has the initial burden to plead sufficient allegations to confer jurisdiction. *Retamco Operating, Inc. v. Republic Drilling Co*., 278 S.W.3d 333, 337 (Tex. 2009). This burden is minimal and is satisfied by an allegation that the nonresident defendant is "doing business" in Texas under the long-arm statute. *See, e.g., Assurances Generales Banque Nationale v. Dhalla,* 282 S.W.3d 688, 695 (Tex. App.—Dallas 2009, no pet.). Therefore, on a special appearance, the defendant "asserting lack of personal jurisdiction by special appearance has the burden of negating all bases of jurisdiction." *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex. 1995). In this case, Trinidad Limited does not dispute that Plaintiffs satisfied the requirements of the Texas long-arm statute; instead, Trinidad Limited challenges jurisdiction only on the basis of due process.

The parties agree on the basic principles of due process, which allows a court to exercise personal jurisdiction over a nonresident defendant when: (1) the defendant has established "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of

fair play and substantial justice." *Internat'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

Two distinct, alternative classes of personal jurisdiction fall within the minimum-contacts prong of this due process test: (1) specific and (2) general. A state may exercise specific jurisdiction over a nonresident defendant when the lawsuit arises from or relates to the defendant's contact with the forum state. *Helicopteros Nationales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 n.8 (1984). In that context, the minimum contacts prong is satisfied by actions, or even a single act, by which the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). The nonresident's "purposeful availment" must be such that the defendant "should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 287 (1980). Conversely, general jurisdiction will exist if the nonresident defendant has had continuous and systematic contacts with the forum state, even if the cause of action did not arise from the defendant's purposeful conduct in that state. *Helicopteros Nationales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-16 (1984).

**IV.** **As a preliminary matter, this Court should apply a _de novo_ review to factual issues, with inferences drawn in favor of jurisdiction.**

As a preliminary matter, Plaintiffs raise an issue regarding the proper standard of review—specifically the standard for reviewing implied factual findings. For reasons discussed in the following sections, this issue is ultimately unnecessary to resolution of this appeal, since the undisputed allegations and the evidence demonstrate that the trial court's decision should be _reversed_ under any standard. Nevertheless, Plaintiffs raise the issue out of abundance of caution.

This Court indisputably applies a _de novo_ review to all legal issues in this case, and that determination of jurisdiction is ultimately a question of law. _See Moki Mac River Expeditions v. Drugg_, 221 S.W.3d 569, 574 (Tex. 2007). However, given that this case was decided on a "cold record," Plaintiffs contend that the Court should also review any necessary factual issues _de novo_, with all inferences drawn in favor of jurisdiction. This is the standard that applies under federal law governing due process analysis. _See, e.g., Guidry v. U.S. Tobacco Co., Inc.,_ 188 F.3d 619, 625 (5th Cir. 1999_)_ ("accept[ing] as true _the nonmover's allegations_ and resolv[ing] all factual disputes in its favor"). Likewise, it is the standard that is most consistent with the overarching principle that the defendant bears the "burden of negating all bases of jurisdiction." _Nat'l Indus. Sand Ass'n v. Gibson,_ 897 S.W.2d 769, 772 (Tex. 1995).

Out of candor, this is not the standard that is typically applied to jurisdictional cases. Instead, Texas courts have routinely applied a standard that gives a degree of deference to the trial court—requiring the appellate court to imply findings in support of the judgment (so long as they are supported by the evidence). *See, e.g., BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). However, this standard was developed from situations in which the trial court: (1) decided jurisdiction on live testimony (meaning the trial court was in a better position to resolve conflicts in evidence); and/or (2) the trial court *denied* the special appearance (making deference justifiable because unresolved conflicts in evidence would simply mean the defendant had failed to negate jurisdiction). For instance, the two most-cited "cold record" cases both dealt with situations in which the trial court *denied* a special appearance (*i.e.* holding that jurisdiction existed). *See Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). In such cases, the implying of findings to support the judgment is: (1) *the same* standard as making inferences and resolving conflicting evidence in favor of retaining jurisdiction (*i.e.,* it is the same as the federal standard); and (2) is consistent with the principle that the defendant bears the burden to negate jurisdiction. *See, e.g., Guidry,*188 F.3d at 625; *Nat'l Indus. Sand Ass'n,* 897 S.W.2d at 772.

In contrast, the application of such standard makes no sense in cases (such as this one), where the trial court *granted* Trinidad Limited's special appearance challenging jurisdiction on a "cold record." Unfortunately, courts have subsequently applied this standard to cases such as this without considering the logical-disconnect, since Plaintiffs typically failed to challenge the standard. Thus, these cases have resulted in snowballing dicta, with courts (including this one) feeling compelled to apply the standard in those few cases where the standard has been challenged—despite recognizing that such a standard is inappropriate. *See, e.g., Wellness Wireless, Inc. v. Vita*, No. 01–12–00500–CV., 2013 WL 978270, *3 n.1 (Tex. App.—Houston [1 Dist.] 2013, no pet.).

However, Plaintiffs do not believe that there is any binding authority from the Texas Supreme Court on this issue. Instead, it appears the Texas Supreme Court addressed this particular issue—"cold record" and order *sustaining* special appearance— for the first time last year, but it declined to make a ruling on this issue. *Moncrief Oil Int'l Inc. v. OAO Gazprom,* 414 S.W.3d 142, 150 n.4 (Tex. 2013). More specifically, the court decided it did not need to address the issue because it determined trial court should be *reversed* regardless of the standard. *Id.*

This Court can do the same in this case, since the following sections demonstrate that Trinidad Limited is subject to jurisdiction regardless of the standard applied to factual review. Nevertheless, *if* the Court determines that the

standard of factual review is determinative on any issue, the Court can and should apply a *de novo* review. In other words, by recognizing that it has not yet decided that issue, the Texas Supreme Court's statement in *Gazprom* presents an opportunity for this Court and other appellate courts to address the issue directly, rather than simply following prior dicta.[2]

Therefore, the Court should apply a *de novo* review of all issues in this case, with all inferences drawn in favor of jurisdiction. This is the standard applied in federal court and it is the standard consistent with the principle that Trinidad Limited bears the "burden of negating all bases of jurisdiction." *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 772 (Tex. 1995).

## V.      Trinidad Limited is subject to specific jurisdiction based on its own acts.

First, Trinidad Limited is subject to jurisdiction for actions taken in its own right, without regard to whether it is subject to jurisdiction for the acts of its subsidiary under alter-ego or other veil-piercing theories (which are not at issue). More specifically, Plaintiff has alleged that Trinidad Limited set operational-level policies for, and exercised control over, its subsidiaries' drilling operations. *See, e.g.,* C.R.35-36 ¶ 3.03; C.R.38-40 ¶¶ 4.07-4.10. However, Trinidad Limited failed to address known safety concerns—including concerns based on "5 previously documented derrick strikes of the same manner that resulted in Nabor's

---

[2] If the Court disagrees and believes it is bound by any prior cases, then Plaintiffs nevertheless reserve the right to raise the issue with the Texas Supreme Court, if appropriate.

death." *See, e.g.*, C.R.35-36 ¶ 3.03; C.R.38-40 ¶¶ 4.07-4.10. As such, these allegations undisputedly state a claim for negligence under Texas law.

In turn, Trinidad Limited knew and intended that its policies would be implemented in Texas and that Texas residents would bear the risk of its negligence in setting such policies. Therefore, Trinidad Limited could "reasonably anticipate being haled into court" in Texas, and it is subject to jurisdiction as to claims arising from these contacts.

### A. As a preliminary matter, there is no dispute that Plaintiffs have pled tort claims based on Trinidad Limited's own actions.

As a preliminary matter, there is no dispute as to whether Plaintiffs have pled tort claims against Trinidad Limited for its own actions. Nor could there be, as Plaintiffs' allegations state direct claims against Trinidad Limited, for its own acts and omissions, under a number of theories.[3] *See* C.R.35-36; C.R.38-40.

---

[3] To use one theory as an illustration, Texas courts have long recognized that a party always has a duty to prevent harm to which its acts contribute. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983); *see also Fox v. Dallas Hotel Co.*, 240 S.W. 517, 520–21 (Tex. 1922), *partially overruled on other grounds by Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981). This principle applies whether the party acted gratuitously or "to promote its own interests." *Fox*, 240 S.W. at 520. Furthermore, this is true whether or not a legal relationship or privity exists between the defendant and the plaintiff. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) *superseded by statute on other grounds,* Tex. Alco. Bev. Code § 2.03(a)*.* Or stated another way, if a person creates or contributes to a situation, it becomes his duty to prevent injury to others if such injuries are reasonably foreseeable. *Id.* (citing *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942)). Indeed, if a defendant contributes to a dangerous situation, even "without negligence on his part," he has a duty to at least "give warning" to those that foreseeably might be injured as a consequence. *Buchanan*, 159 S.W.2d at 110. Thus, Plaintiffs' allegations state negligence and gross negligence claims against Trinidad Limited based on Trinidad Limited's own actions, separate and apart from any liability that might accrue based on its subsidiary's actions. Therefore, there is no question that Plaintiffs may assert their claims against Trinidad Limited.

More to the point, there can be no dispute as to the merits of Plaintiffs' claims at this stage of the proceeding, because a court may not examine the merits on a special appearance. *See, e.g., Nogle & Black Aviation, Inc. v. Faveretto*, 290 S.W.3d 277, 284 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Instead, the allegations regarding the merits must be taken as true at the special-appearance stage. *E.g., Id.* ("We take the allegations in the petition as true at the special appearance stage.").

Therefore, the only question is whether Plaintiffs can pursue their claims against Trinidad Limited in Texas—in the same court and at the same time as all their other claims—or whether Plaintiffs will be required to bring an additional suit, in another forum that is far from their residences and far from the location where the accident occurred. As such, the only two factual issues that can be considered on this special appearance are: (1) whether Trinidad Limited exercised control over, or issued operational policies for, aspects of drilling operations; and (2) whether Trinidad Limited knew or intended that such control or policies would extend to operations in Texas. As shown in the following two subsections, the evidence and undisputed allegations demonstrate that both questions must be answered in the affirmative.

***B.*** ***The evidence and uncontroverted allegations show Trinidad Limited set operational policies and exercised operational control over Trinidad L.P.'s drilling operations in Texas.***

**1. The *uncontroverted allegations* show that Trinidad Limited exercised operational control and set operational policies for Trinidad L.P.**

The first factual issue—whether Trinidad Limited set operational policies and exercised operational control over drilling operations—is straightforward, as it can be decided based on Plaintiffs' *uncontroverted allegations*. In part, Plaintiffs alleged that:

- Trinidad Limited "directs, controls and supervises the HSE (Health, Safety and Environment) of the drilling operations of TRINIDAD, LP," C.R.35-36 ¶ 3.03;

- Trinidad Limited "investigates, creates and issues policy manuals and procedures for [Trinidad L.P.]," C.R.35-36 ¶ 3.03; and

- "At all relevant times" Trinidad Limited "exercised . . . control and took responsibility for overseeing safety policies and procedures for the crews on the drilling rigs," C.R.38 ¶ 4.07.

Trinidad Limited purports to controvert these allegations in paragraphs15-17 of the affidavit accompanying its Amended Special Appearance:

15. Trinidad Drilling Limited does not control *the payroll* of Trinidad LP.

16. The *directors* of Trinidad Limited do not make decisions to control the day to day operations of Trinidad LP,

17. Trinidad Drilling Limited does not control any of the *day to day sales* offered by Trinidad LP in Texas.

C.R.29 (emphasis added). However, these qualified statements *avoid* controverting the particular allegations that were actually made by Plaintiffs.

First, there are no statements (either in this affidavit or the subsequent affidavit in August 2014) that address the issue of control "[a]t all relevant times." *See* C.R.38 ¶ 4.08. In other words, all statements regarding control are made in the present tense. Thus, none of the statements address the key question of whether Trinidad Limited exercised control or took responsibility during "the relevant time" of 2010, when the accident occurred. As such, Plaintiffs' allegations of control and responsibility in paragraph 4.07 of its Third Amended Petition *must be taken as true. See, e.g. Nogle & Black Aviation, Inc.*, 290 S.W.3d at 284.

Moreover, leaving aside the issue of timing, the statements of Trinidad Limited's affiant still avoid addressing the allegations made by Plaintiffs. In paragraph 15, the affidavit addresses only control of "payroll," and does not address control of safety or drilling operations. *See* C.R.29 In paragraph 17, the affidavit addresses only control of "day to day sales," and does not address control of safety or drilling operations. *See* C.R.29.

The qualifications in paragraph 16 are even more disingenuous. This paragraph does purport to address control of "operations" but only in the sense of "day to day" operations. More importantly, it addresses only control by "directors," a qualification that can only be intended to obfuscate the true facts.

C.R.29. The role of "directors" is never to control the day-to-day operations of a company. Instead, such control is exercised by officers, employees, and agents. But the affidavit is completely silent as to the control of Trinidad L.P.'s operations through such persons.

In short, these allegations of Plaintiffs' live pleading were never controverted by Trinidad Limited.[4] As such, these allegations *must* be taken as true, and the trial court was therefore *required* to find that Trinidad Limited exercises control over the safety of Trinidad L.P.'s drilling operations, and that it did so at the relevant time period.

> **2.     Even if Plaintiffs' allegations had been controverted, the great weight of evidence demonstrates that Trinidad Limited retained the right to control, and set operational policies for, drilling operations.**

Because the relevant allegations were not controverted, the inquiry is ended on this issue. Plaintiffs' allegations must be taken as true, and the Court need not (and cannot) consider any additional evidence.

Nevertheless, if the Court were to consider additional evidence, the great weight of such evidence supports Plaintiffs' allegations. First, Trinidad Limited maintained a superintendent (Brent Kryzanowski) devoted specifically to the type of drilling rig—a so-called "top drive" rig—that is at issue in this case. *See, e.g.*

---

[4] These failures in the affidavit were expressly pointed out by Plaintiffs' response below. *See, e.g.,* C.R.51-52.

C.R.80; Supp. C.R.41. This superintendent was involved in the oversight of Trinidad L.P.'s drilling operations, and it was this superintendent whose emails provided evidence that Trinidad Limited had prior notice of similar accidents. *See, e.g.* C.R.80; Supp. C.R.41.

Similarly, a report of Rodney Foreman, as "General Manager of Corporate HSE" of "Trinidad Drilling Ltd.," demonstrated that Trinidad Limited retained control over the operational details of the drilling operations and crews. *See* C.R.79. More specifically, Mr. Foreman's report of this particular incident also outlined the "Remedial Action Plans" to be rolled out by the Trinidad Limited's "US Northern, US Southern, [and] Canadian Drilling" divisions. C.R.80. These plans did not merely set general policies; rather, they involved specific actions regarding the on-site equipment and crews. *See* C.R.80 (discussing "Phase 1"). While these subsequent remedial measures are not admissible to prove negligence (which is not at issue on this motion),[5] they are admissible to prove that Trinidad Limited retained "control" over aspects of the drilling operations, including the safety aspects. *See* Tex. R. Evid. 407.

Although Trinidad Limited contends Mr. Foreman was employed and paid by Trinidad L.P., these contentions are irrelevant to the analysis. Whether or not

---

[5] As noted above in section V(A)(1), the question of negligence cannot be inquired to on a special appearance. Instead, the Court must accept the allegations of negligence as true.

Mr. Foreman was paid by Trinidad Limited or whether he wore additional "hats" for Trinidad L.P., the undisputed evidence demonstrates that he was also acting on behalf of Trinidad Limited (the parent company) in connection with this report:

- First, in his emails, he holds himself out as representing the parent company, as "General Manager of Corporate HSE" of "Trinidad Drilling Ltd.." C.R.79. Moreover, this was done with the full knowledge of Trinidad Limited's highest officers. *See, e.g.,* C.R.79-80 (sent to CEO, Executive VP, etc.). In fact, during the relevant time period, Trinidad Limited itself held out Mr. Foreman as its own "General Manager of Corporate HSE" in its public communications. Supp. C.R.313.

- Second, Mr. Foreman testified that he reported to Ed Oke, and he referred to Ed Oke as his "boss." C.R.90-91. However, Mr. Oke was the "Vice-President Human Resources and Safety" of "Trinidad Drilling Ltd." (*i.e.,* the parent company), as opposed to the officer of Trinidad L.P. C.R.75-76, C.R.90, Supp. C.R.329.

- Third, the Remedial Action Plans were not limited to Trinidad L.P. Rather they applied to *all* of Trinidad Limited's operations in both the United States and Canada. C.R.80. And it was Mr.

Foreman who was to provide instruction and receive information from each of the division vice presidents (of the parent company) in their implementation of the plans.

In any event, regardless of Mr. Foreman's role in the Remedial Action Plans, the nature of the plans makes clear that they were made by Trinidad Limited (the parent company). Recipients of the report were officers or employees of Trinidad Limited (the parent company), the remedial plans applied to operations in both the United States and Canada, and implementation of the plans expressly required the assistance and approval of the division vice presidents. Thus, the weight of evidence shows that Trinidad Limited retained control over, and set safety policies for, on-site drilling operations.

In its briefing before the trial court, Trinidad Limited argued that "[a]ppropriate parental involvement includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies. C.R.23 (quoting *PHC-Minden, L. P. v. Kimberly Clark, Corp.,* 235 S.W.3d 163, 176 (Tex. 2007)). However, such argument is irrelevant for two relatively-obvious reasons.

First, the quoted language is not relevant to the question of a parent company's own minimum contacts. Rather, it is a statement regarding the degree of control needed to pierce the corporate veil, such that the parent and subsidiary

are treated as one and the same. However, that is not the theory advanced by Plaintiffs here. Instead, Plaintiffs have alleged that Trinidad Limited is subject to liability and jurisdiction based on its *own acts*. In such cases, the question is not whether the parent has exercised an inordinate amount of control, but rather whether the cause of action arises from whatever control is exercised. In other words, even articulation of a "general policy" could lead to jurisdiction, *if* the claim arose from the particular policy.

Perhaps more importantly, the control retained in this case goes well beyond the principles described in *PHC-Minden*. As shown by the undisputed facts and evidence above, Trinidad Limited's actions were not limited to "monitoring." Nor do the allegations involve "finance or capital budget decisions." Nor do they involve "general policies." Instead, Plaintiffs have alleged that Trinidad Limited's control extended to the operation aspects of the drilling operations, and in particular, that Trinidad Limited "took responsibility for overseeing safety policies and procedures for the crews on the drilling rigs" during the relevant time period. *See* C.R.38 ¶ 4.07. Moreover, the undisputed evidence shows that it retained control over operation policies regarding both: (1) modification of actual drilling equipment; and (2) activities of on-site personnel. *See* C.R.80 (discussing "Phase I").

Finally, Plaintiffs' allegations are supported by Trinidad Limited's own evidence regarding its officers' and employees' travel to Texas during the relevant time period. In response to the Amended Special Appearance, Plaintiffs pointed out that Trinidad Limited's officers and employees had made 126 trips to Texas during the years preceding the accident, including multiple trips by Ed. Oke, its vice president of health, safety, and environment issues. *See, e.g.,* C.R.58; C.R.68-69. Trinidad Limited acknowledges these trips were made to Texas, that they were for the purpose of "getting [Trinidad L.P.] up and running" and making it "operable," and that the trips were made to protect Trinidad Limited's interests. C.R.115. While such testimony might be useful in the alter-ego context, it undercuts any argument Trinidad Limited might make as to jurisdiction for its *own negligence.*[6] Regardless of what control Trinidad Limited *now* exercises, this testimony demonstrates that: (1), Trinidad Limited was exercising a significant amount of control during the period extending through mid-2010; (2) the control was, at least in part, conducted by "officers and managers" with a *physical* connection to Texas; and (3) the control was intended for Trinidad Limited's benefit. *See* C.R.115. Indeed, Trinidad Limited acknowledged that corporations

---

[6] Trinidad Limited also asserts that its officers and managers were merely setting up operations (*i.e.* making the subsidiary "operable" and "getting it up and running"), rather than "conducting marketing activities [or] promoting services to customers." C.R.115 ¶ 17. However, such contentions are irrelevant to this analysis, as Plaintiffs' claims do not arise from "marketing activities" or "promoting services." The claims arise from allegations that Trinidad Limited controlled aspects of drilling operations, and Trinidad Limited's affidavit merely confirms that its officers and employees exercised such control during the relevant time period.

"require work from people," and as the Supreme Court has made clear, a corporation is responsible for the actions of its *"people"*—officers, directors, employees, and agents. *See Internat'l Shoe v. Washington*, 326 U.S. 310, 316 (1945) (noting that a corporation's presence, for personal jurisdiction purposes, is "manifested only by activities carried on in its behalf by those who are authorized to act for it"). In this case, Trinidad Limited's own evidence shows that its *own people* set up operational policies and exercised control over Trinidad L.P.'s operations during the relevant time period, and some of those *people* made actual, *physical* contact with the state of Texas.

### C. Trinidad Limited knew and intended that its control would extend to drilling operations in Texas and that Texas residents would bear the risk of any negligent policies or control.

In short, Trinidad Limited retained control over, and set policies for, the safety of its drilling operations. *See supra,* Section V(B). Furthermore, Plaintiffs have alleged that Trinidad Limited did so negligently, and Plaintiffs' claims arise from such negligence, *See supra,* Section V(A) (noting that Plaintiffs' allegations of negligence are taken as true). Therefore, the only remaining factual question is whether Trinidad expected that the control and policies would extend to drilling operations *in Texas*.

On this question, there is no dispute. Plaintiffs have alleged not only that Trinidad Limited controlled the safety aspects of Trinidad L.P., but that it did so as

to "drilling practices in Texas." C.R.38 ¶ 4.09; *see also* C.R.35-36 ¶ 3.03; C.R.38 ¶ 4.07. Trinidad Limited has not controverted these allegations. Nor could it do so, as there is no dispute that Trinidad L.P. conducted its operations—including the drilling operation that resulted in Nabor Alvarado's death—*in Texas*.

The only conceivable argument that Trinidad Limited could make would be to argue that the connections to Texas were the result of "unilateral activity of another party or third person." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays,* 815 S.W.2d 223 at 226 (Tex. 1991) (citations omitted). Specifically, Trinidad Limited would have to argue that the decisions to conduct drilling operations in Texas were made solely by Trinidad L.P., without the knowledge or approval of its parent, Trinidad Limited. But Trinidad Limited has not made such an argument, which would be nonsensical given the scope of Trinidad L.P.'s operations and its importance to Trinidad Limited's business.

In any event, the undisputed evidence shows that Trinidad Limited not only knew that drilling operations would be conducted in Texas, but that Trinidad Limited actively participated in the formations of such operations. On this point, a couple of examples will suffice.

First, Trinidad Limited's officers and employees admittedly made 126 trips to Texas in the time period preceding the accident, in order to make Trinidad L.P. "operable" and to get it "up and running." *See* C.R.115. These trips have already

been discussed in the context of whether Trinidad Limited controlled aspects of Trinidad L.P.'s drilling operations during the relevant time period. *See supra*, Section V(B)(2). However, they are even more significant on this point, as they indisputably demonstrate that Trinidad Limited's management knew and intended that Trinidad L.P. would conduct drilling operation *in Texas*.

Perhaps even more damning, the undisputed evidence shows that Trinidad Limited knew of, intended, *and supported* the particular drilling operations that resulted in Nabor Alvarado's death *in Texas*. More specifically, Plaintiffs' submitted invoices showing that Trinidad Limited purchased the very rig—the "top drive" Rig no. 130—that resulted in his death. *See* C.R.51; C.R.65-66; C.R.81. However, Trinidad Limited contends that the rig was not purchased by Trinidad Limited, but that Trinidad Limited financed the transaction "on behalf of" its subsidiary. Supp. C.R.356 ¶ 24. Moreover, the testimony stated that the financing was expressly intended to allow Trinidad L.P. to satisfy a drilling contract in "the Fort Worth basin" *in Texas*. *See* Supp. C.R.356 ¶ 24; Supp. C.R.444. As such, Trinidad Limited not only knew of, but actively supported, drilling operations *in Texas*—drilling operations to which its policies and control would apply.

Therefore, the undisputed evidence shows that Trinidad Limited knew, and fully intended, that its control and policy-making would extend to drilling operations in Texas—and even to the drilling operations that resulted in Nabor

Alvarado's death. Likewise, Trinidad Limited knew that Texas residents would bear the risk of harm from the any negligence in such policies.

> **D.** **Therefore, Trinidad Limited is subject to specific jurisdiction, as it could "reasonably anticipate being haled into Court" in Texas and the exercise of jurisdiction would not offend fair play and substantial justice.**

As discussed above in Section III, the issue of due process involves: (1) whether the non-resident defendant has sufficient minimum contacts with the State of Texas to avail itself of jurisdiction; and, (2) whether the exercise of personal jurisdiction over the nonresident defendant offends the notions of fair play and substantial justice. *E.g., Internat'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). More specifically, Trinidad Limited has the burden to establish that due process is not satisfied. *See, e.g.*, *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex. 1995). However, in this case, Trinidad Limited has not negated either element.

For specific jurisdiction, the minimum-contacts requirement is satisfied if: (1) the defendant's activities were purposefully directed toward the forum state; and (2) there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *E.g. Helicopteros Nationales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 n.8 (1984). This test does not require that the defendant "physically enter the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985). Instead, the defendant need only have

purposefully directed in such a manner that it "should reasonably anticipate being haled into court" in the forum state. *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 628-630 (5th Cir. 1999).

In this case, the foregoing subsections demonstrate that:

1. Trinidad Limited exercised control over, set policies for, and took responsibility for aspects of Trinidad L.P.'s drilling operations in Texas, *see supra,* Section V(B);

2. Trinidad Limited knew and intended that Trinidad L.P.'s drilling operations would be conducted in Texas, and that its control and policy-setting would therefore extend to Texas operations, *see supra,* Section V(C); and

3. Plaintiff has alleged that Trinidad Limited was negligent in exercising control and setting policies, and Plaintiff's claims arise from such negligence, *see supra,* Section V(A).

In short, Trinidad limited knew that its control and policy-setting would apply to actions in Texas and that Texas citizens would bear the risk of any negligence in such actions. In other words, Trinidad Limited could "reasonably anticipate being haled into court" in Texas. Therefore, Trinidad Limited has failed to negate the minimum-contacts element of due process.

Likewise, Trinidad Limited has failed to negate the "fair play and substantial justice" aspect of due process. *See, e.g., As-ahi A1etal Industries Co. v. Superior Court,* 480 U.S, 102, 113 (1987) (listing factors). Given the heightened protections that have developed in the minimum-contacts analysis over the years, a finding of

minimum contacts will also satisfy this aspect of due process, except in "rare cases." *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays*, 815 S.W.2d 223, 231 (Tex. 1991) (citations omitted).  And this is not such a case.

Here, the interests of Plaintiffs (who include minor children) "in obtaining convenient and effective relief" obviously weighs in favor of retaining jurisdiction. If jurisdiction is retained, then it is likely all claims against all parties can be tried in the same case, in a convenient forum in the same state in which the accident occurred.  In contrast, dismissal would require the Plaintiffs to bring a separate suit in a distant and unrelated forum.  For the same reasons, Texas's "interest in adjudicating the dispute" and the judicial system's "interest in obtaining the most efficient resolution of controversies" both weigh in favor of retaining jurisdiction. By comparison, the "burden" on Trinidad Limited is relatively light.  Although Texas is far from its place of incorporation, Trinidad Limited has proven itself able to adjudicate in this forum, just as it has proven itself able to create a subsidiary to conduct drilling operations in Texas, to get that subsidiary's operations "up and running," and then to reap millions of dollars in profits from those operations.

In summary, Trinidad Limited has failed to present a "compelling case" that jurisdiction is unreasonable. *See Burger King Corp.,* 471 U.S. at 477.  If anything, this is one of those cases in which the interests of fair play and substantial justice

"serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Id.*

Therefore, Trinidad Limited has failed to show that due process is not satisfied. Instead, the undisputed facts and evidence demonstrate that Trinidad Limited is subject to specific jurisdiction, and the trial court's decision must be reversed on this basis.

## VI. <u>Trinidad Limited is also subject to general jurisdiction based on its own acts.</u>

In addition to demonstrating that Trinidad Limited is subject to specific jurisdiction, Plaintiff has also produced evidence showing that Trinidad Limited is subject to general jurisdiction in Texas. General jurisdiction is applicable if the defendant's activities reveal a pattern of "continuing and systematic activity" connected to the state. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 359 (Tex. 1990). This test does not require physical presence in the state. *See, e.g., Temperature Sys., Inc. v. Bill Pepper, Inc.,* 854 S.W.2d 669, 676 (Tex. App. –Dallas 1993, writ dism'd by agr.) (purchases from Texas residents and relationship with Texas distributor established minimum contacts) and *Design Info. Sys. v. Feith Sys. & Software, Inc.,* 801 S.W.2d 569, 571 (Tex. App.—Fort Worth 1990, no writ), *rev'd in part on other grounds,* 813 S.W.2d 481 (Tex. 1991) (twenty-five customers in Texas established minimum contacts).

Although the discussion in the previous section focused on specific jurisdiction, much of the same evidence would apply to an analysis of general jurisdiction. For instance, in addition to allegations that Trinidad Limited controlled aspects of drilling operations at the "relevant times" regarding the accident, Plaintiffs have alleged that Trinidad Limited also exercised control and sets policies in the present tense. *See, e.g.* C.R.35-36 ¶ 3.03. Likewise, Plaintiffs produced evidence showing that such control was reinforced by 126 actual, physical visits to Texas by Trinidad Limited's own officers and employees through the time of the accident.[7]

Moreover, the previously-discussed evidence demonstrates that Trinidad Limited had an employee, or at least an agent, that maintained a physical presence in Texas. More specifically, Rodney Foreman, as "General Manager of Corporate HSE" of "Trinidad Drilling Ltd.," maintained his office in or around the Houston area. *See* C.R.79 (showing "office" phone number with 713 area code).[8] Trinidad Limited contends that Mr. Foreman is an employee or officer of Trinidad L.P. and was paid by Trinidad L.P. However, even if true, these contentions do not controvert the fact that Mr. Foreman was also an agent of Trinidad Limited, at the

---

[7] In response to the Amended Special Appearance, Plaintiffs moved to compel discovery responses as to subsequent visits to Texas but did not obtain a ruling prior to the Court sustaining Appellee's special appearance.

[8] The Court can take judicial note that 713 is the area code for the Houston area.

very least. *See supra,* Section V(B)(2) (discussing issue). Mr. Foreman held himself out as the "General Manager of Corporate HSE" of "Trinidad Drilling Ltd." with the full knowledge of Trinidad Limited's highest officers. C.R.79-80. Likewise, Trinidad Limited did the same in its own official presentations to the outside world. Supp. C.R.313. Second, Mr. Foreman testified that he reported to Ed Oke, and he referred to Ed Oke as his "boss." C.R.90-91. Yet Mr. Oke was the "Vice-President Human Resources and Safety" of "Trinidad Drilling Ltd." (*i.e.,* the parent company), as opposed to the officer of Trinidad L.P. C.R.75-76, C.R.90, Supp. C.R.329. Therefore, whatever "hats" Mr. Foreman might have worn for Trinidad L.P., he also wore the "General Manager of Corporate HSE" "hat" for Trinidad Limited. And he did so from a physical office *within the state of Texas*. *See* C.R.79.

Finally, Trinidad Limited's own annual reports reveal that its "banker" has been "Wells Fargo, N.A." in "Houston, Texas," and that it has a director who resides in Texas. *See, e.g.,* Supp. C.R.237; C.R.267; C.R.300; C.R.329; C.R.348. Trinidad Limited contends that it does not bank with Wells Fargo, but rather that Wells Fargo is used by Trinidad L.P. But that is not what the annual reports say. To the contrary, the annual reports all define "Trinidad" and the "Company" as "Trinidad Drilling Ltd.". *See, e.g.,* Supp. C.R.288; Supp. C.R.322 Moreover, Trinidad Limited's "bankers" and "directors" are listed on its "Corporate

Information" page, and all of the information on this page refers to "Trinidad Limited." *See, e.g.,* Supp. C.R.237 (listing only Trinidad Limited's officers, directors, etc.).

As the Southern District of New York has so aptly noted: "There cannot be one 'truth' for the world at large, and a different 'truth' for the Court." *See Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, No. 01 CIV. 3016(AGS)(HB), 2002 WL 1835439, *5 n.2 (S.D.N.Y. 2002).[9] In this case, Trinidad Limited's self-serving contentions do not controvert the bulk of the evidence showing that Trinidad Limited has maintained continuous and systematic contacts with Texas. As such, the great weight and preponderance of evidence demonstrates that Trinidad Limited is subject to general jurisdiction. Moreover, even if this were not the case under ordinary standards, the fair-play and substantial-justice factors, discussed in the prior section, are such that Trinidad Limited's contacts would "serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *See Burger King Corp.,* 471 U.S. at 477.

Therefore, the trial court's decision should be overruled on this additional basis.

---

[9] *See* Appellants' Appendix A.

## VII. <u>Prayer</u>

For the reasons stated above, Appellants respectfully pray that this Court reverse the trial court, render a decision denying Trinidad Limited's special appearance, and remand this action for proceedings on the merits.

Respectfully submitted,

By   */s/ Geoffrey E. Schorr*

Geoffrey E. Schorr
geoff@schorrfirm.com
Texas Bar No. 24029828
A. Jared Aldinger
Texas Bar No. 24068456
jared@schorrfirm.com
SCHORR LAW FIRM, PC
328 W. Interstate 30, Suite 2
Garland, TX 75043
Tel. (972) 226-8860
Fax (972) 226-9787

Hutton W. Sentell
Texas Bar No. 24026655
hsentell@ashmorelaw.com
ASHMORE LAW FIRM, P.C.
3636 Maple Ave.
Dallas, TX 75219
Tel. (214) 559-7202
Fax (214) 520-1550

Andrew P. McCormick
Texas Bar No. 3457100
amccormick@mlm-lawfirm.com
McCORMICK, LANZA & McNEEL, LLP
4950 Bissonnet Street
Bellaire, TX 77401
Tel. (713) 523-0400

Fax (713) 523-0408
ATTORNEYS FOR
PLAINTIFFS/APPELLANTS ADELAIDA
SALAZAR BAUTISTA a/k/a  ADELAIDA
ALVARADO, Individually, and as next
friend of MARIA JENNIFER AIDE a/k/a
MARIA JENNIFER ALVARADO,
AURELIA ALVARADO, ALEJANDRA
ALVARADO, IVAN SALAZAR
ALVARADO, MARIAN ALVARADO, and
EDUARDO ALVARADO, Minors

and


By: */s/ Justin K. Hall*
Justin K. Hall
Texas Bar No. 90001828
jkhall@justinkhall.com
328 W Interstate 30, Suite 2
Garland, Texas  75043
Tel. (972) 226-1999
Fax  (972) 226-2221
Attorney for Plaintiffs, Irineo Alvarado and
Maria Ana Moctezuma

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of TEX. R. APP. P. 9.4(i)(2)(B) because it contains 7,911 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(1). In making this certification, I am relying on a word count performed by the Microsoft Word software used to prepare this brief.

By  */s/ Geoffrey E. Schorr*
Geoffrey E. Schorr


## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2015, a true and correct copy of this Appellants' Brief was served on counsel for Appellee via: the Texas e-file system which will send a notice of this electronic filing to Michael Beckelman, at his email address on file with the electronic filing manager.

By  */s/ Geoffrey E. Schorr*
Geoffrey E. Schorr

No. 01-14-00892-CV

In the Court of Appeals
for the First Judicial District
Houston, Texas

---

ADELAIDA SALAZAR BAUTISTA A/K/A ADELAIDA ALVARADO,
INDIVIDUALLY AND AS NEXT FRIEND OF MARIA JENNIFER AIDE
A/K/A MARIA JENNIFER ALVARADO, A. A. A. A., I. S. A., M. A., AND E.
A., MINORS; AND IRINEO ALVARADO AND MARIA ANA MOCTEZUMA,

Appellants,

v.

TRINIDAD DRILLING LIMITED,

Appellee.

---

On Appeal from the
270th Judicial District Court of Harris County

---

## **APPENDIX TO APPELLANTS' BRIEF**

---

**APP**        **DESCRIPTION**

A.        *Twentieth Century Fox Film Corporation v. Marvel Enterprises, Inc.,*
          2002 WL 1835439 (S.D.N.Y.)


Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)
**(Cite as: 2002 WL 1835439 (S.D.N.Y.))**



Only the Westlaw citation is currently available.


United States District Court, S.D. New York.
TWENTIETH CENTURY FOX FILM CORPORA-
TION, Plaintiff,
v.
MARVEL ENTERPRISES, INC., et al., Defendants.


No. 01 CIV. 3016(AGS)(HB).
Aug. 8, 2002.


Plaintiff, a licensee of copyrighted characters, brought copyright infringement suit against parent corporation that owned television station that aired program allegedly based on the copyrighted characters. Plaintiff sought order directing defendant to produce a witness who was properly prepared to testify concerning certain documents allegedly produced by the television station concerning the program. The District Court, Pittman, Magistrate Judge, held that defendant would be required to provide such a witness, given defendant's control over the television station.


So ordered.


West Headnotes


**[1] Federal Civil Procedure 170A ⚷1325**


170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(C) Depositions of Parties and Others Pending Action
            170AX(C)1 In General
                170Ak1323 Persons Whose Depositions May Be Taken
                170Ak1325 k. Officers and employees of corporations. Most Cited Cases


Entity receiving notice of deposition must produce witness prepared with knowledge of both the entity that received the subpoena and its subsidiaries or affiliates. Fed.Rules Civ.Proc. Rule 30(b)(6), 28 U.S.C.A.


**[2] Federal Civil Procedure 170A ⚷1534**


170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(D) Written Interrogatories to Parties
            170AX(D)3 Answers; Failure to Answer
                170Ak1534 k. Sufficiency; supplementation of answers. Most Cited Cases


Corporation responding to interrogatories must provide not only the information contained in its own files and possessed by its own employees, it must also provide all information under its control; thus, when the parent is served with an interrogatory, it is no defense to claim that the information is within the possession of a wholly owned subsidiary, because such a corporation is owned and controlled by such interrogee. Fed.Rules Civ.Proc. Rule 30(b)(6), 28 U.S.C.A.


**[3] Copyrights and Intellectual Property 99 ⚷84**


99 Copyrights and Intellectual Property
    99I Copyrights
        99I(J) Infringement
            99I(J)2 Remedies
                99k72 Actions for Infringement
                  99k84 k. Discovery. Most Cited Cases

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)
**(Cite as: 2002 WL 1835439 (S.D.N.Y.))**

Parent corporation that owned and operated television station would be required to provide, in response to notice of deposition, a witness prepared with knowledge of the television station to testify concerning certain documents that were apparently produced by television station and that were relevant to litigation over copyrighted cartoon characters; corporation's control over television station was established by its public statements, including its internet web page, which stated that it owned and operated 23 major-market television stations, including station at issue. Fed.Rules Civ.Proc., Rule 30(b)(6), 28 U.S.C.A.

Diana M. Torres, Esq., Samantha L. Hetherington, Esq., Dale M. Cendali, Esq., O'Melveny & Myers, LLP, New York.

Jonathan D. Reichman, Esq., John R. Hutchins, Esq., Dana R. Kaplan, Esq., Kenyon & Kenyon, New York.

Maura J. Wogan, Esq., Gerald Singleton, Esq., Frankfurt, Garbus, Klein & Selz, New York.

Steven H. Rosenfeld, Esq., Ohrenstein & Brown, L.L.P., New York.

MEMORANDUM OPINION AND ORDER
PITMAN, Magistrate J.

I. *Introduction*

**\*1** Plaintiff seeks an Order either permitting it to take an additional deposition beyond the limit of thirty depositions per side that has been imposed in this case or directing Tribune Broadcasting Company ("Tribune Broadcasting") to produce a 30(b)(6) witness properly prepared to testify concerning certain documents.

II. *Facts*

The facts in this case are fully set forth in Judge Schwartz's decision addressing plaintiff's motion for a preliminary injunction and defendants' motion to dismiss, *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,* 155 F.Supp.2d 1 (S.D.N.Y.2001), *aff'd, Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,* 277 F.3d 253 (2d Cir.2002). Familiarity with both of these decisions is assumed. For present purposes it is sufficient to note that plaintiff is the licensee of copyrighted characters created by defendant Marvel Enterprises, Inc., and known as the X–MEN. In July, 2000, pursuant to its license, plaintiff released a full length, live action motion picture based on these characters, entitled "X–MEN." Plaintiff alleges, among other things, that defendant Tribune Entertainment's television program, MUTANT–X, infringes on plaintiff's rights in the X–MEN and that defendants have attempted to pass off their MUTANT–X television program as being related to plaintiff's motion picture.

The present dispute has its genesis in a subpoena served on Tribune Broadcasting, the parent of defendant Tribune Entertainment Company. In response to a subpoena duces tecum, Tribune Broadcasting produced a document on "WGN" letterhead. WGN–TV and WGN Superstation are a local Chicago television station and a cable television station, respectively, that are both owned and operated by Tribune Broadcasting; the letterhead on the document in issue merely states "WGN Entertaining America," with no further description. The document appears to be a script for a sales presentation and suggests that there is a close association between plaintiff's X–MEN motion picture and defendants' MUTANT–X television program.

Tribune Broadcasting's 30(b)(6) witness denied knowledge of the document and stated that it was a WGN document [FN1]; he did not specify whether he was referring to WGN–TV or WGN Superstation. As a result of that testimony, plaintiff served a further subpoena and deposition notice. The subpoena was addressed to "WGN–TV, 2501 W. Bradley Place, Chicago, IL 60618" (Torres 7–16–02 Ltr., Ex. B). The

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)
**(Cite as: 2002 WL 1835439 (S.D.N.Y.))**

accompanying notice of deposition was addressed to "WGN–TV/Superstation (Chicago),", and the schedule attached to the subpoena defined "WGN" as

> FN1. The topics listed in the Rule 30(b)(6) notice served on Tribune Broadcasting included "The advertising, marketing, sale and/or promotion of [defendants' television series]" (Letter of Diana M. Torres, Esq., dated July 16, 2002 ("Torres 7–16–02 Ltr."), at 1, n. 1).

WGN–TV/Superstation and any of its predecessor and successor entities, affiliates, subsidiaries, agents, servants, representatives, and/or attorneys, and all other persons acting or purporting to act on WGN's behalf
(Torres 7–16–02 Ltr., Ex. B). The schedule attached to the subpoena annexed a copy of the document described above and designated it as a subject of examination.

**\*2** In response to this subpoena, a witness from WGN–TV was produced. Like the witness produced on behalf of Tribune Broadcasting, he also disclaimed knowledge of the document in dispute and claimed that it appeared to be a script from WGN Superstation.

According to statements made in the course of oral argument concerning the current dispute held on July 30, 2002, neither WGN–TV nor WGN Superstation is a legally cognizable entity; both are owned by several corporations which are ultimately owned by Tribune Broadcasting.

I had previously limited each side in this case to a total of thirty depositions. Since the deposition resulting from plaintiff's subpoena to WGN–TV was plaintiff's thirtieth deposition, it cannot now seek a deposition of WGN Superstation without relief from the Court.

In connection with the current dispute, both sides have each submitted three letter briefs. In addition, as noted above, I heard oral argument by telephone on July 30, 2002..

III. *Analysis*

[1] The current dispute raises the issue of whether an entity receiving a notice of deposition pursuant to Rule 30(b)(6) is obligated to produce a witness prepared with the knowledge of both the entity that received the subpoena and its subsidiaries or affiliates. I conclude that the scope of the entity's obligation in responding to a 30(b)(6) notice is identical to its scope in responding to interrogatories served pursuant to Rule 33 or a document request served pursuant to Rule 34, namely, it must produce a witness prepared to testify with the knowledge of the subsidiaries and affiliates if the subsidiaries and affiliates are within its control.

It is well settled that a witness appearing pursuant to a Rule 30(b)(6) notice has a unique status and testifies as the entity, not as an individual. "A deposition pursuant to Rule 30(b)(6) is substantially different from a witness's deposition as an individual. A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity." *Sabre v. First Dominion Capital,* LLC, 01 Civ. 2145(BSJ)(HBP), 2001 WL 1590544 at \*1 (S.D.N.Y. Dec. 12, 2001), *citing* 8A Charles A. Wright, Arthur R. Miller, Richard L. Marcus, *Federal Practice & Procedure* § 2103 (2d ed.1994). As comprehensively explained by Magistrate Judge Eliason of the Middle District of North Carolina:

> The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents. The designated witness is "speaking for the corporation," and this testimony must be distinguished from that of a "mere corporate employee" whose deposition is not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)
**(Cite as: 2002 WL 1835439 (S.D.N.Y.))**

considered that of the corporation and whose presence must be obtained by subpoena. 8A Wright, Miller & Marcus § 2103, at 36–37.... If the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation. *Dravo Corp. v. Liberty Mut. Ins. Co.,* 164 F.R.D. 70, 75 (D.Neb.1995) (citing *Marker,* 125 F.R.D. at 126). Thus, the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally volved. *Buycks–Roberson v. Citibank Federal Sav. Bank,* 162 F.R.D. 338, 343 (N.D.Ill.1995); *S.E.C. v. Morelli,* 143 F.R.D. 42, 45 (S.D.N.Y.1992).

**\*3** The Rule 30(b)(6) designee does not give his personal opinions. Rather, he presents the corporation's "position" on the topic. *U.S. v. Massachusetts Indus. Finance Agency,* 162 F.R.D. 410, 412 (D.Mass.1995); *Lapenna v. Upjohn Co.,* 110 F.R.D. 15, 21 (E.D.Pa.1986); *Toys "R" Us, Inc. v. N.B.D. Trust Company,* No. 88C10349, 1993 WL 543027, at \*2 (N.D.Ill. Sept.29, 1993). Moreover, the designee must not only testify about facts within the corporation's knowledge, but also its subjective beliefs and opinions. *Lapenna,* 110 F.R.D. at 20. The corporation must provide its interpretation of documents and events. *Ierardi v. Lorillard, Inc.,* Civ. A. No. 90–7049, 1991 WL 158911 (E.D.Pa. Aug.13, 1991). The designee, in essence, represents the corporation just as an individual represents him or herself at a deposition. Were it otherwise, a corporation would be able to deceitfully select at trial the most convenient answer presented by a number of finger-pointing witnesses at the depositions. *See Lapenna,* 110 F.R.D. at 25. Truth would suffer.

... The attorney for the corporation is not at liberty to manufacture the corporation's contentions. Ra-

ther, the corporation may designate a person to speak on its behalf and it is this position which the attorney must advocate.

... Rule 30(b)(6) explicitly requires [a corporation] to have persons testify on its behalf as to all matters known or reasonably available to it and, therefore, implicitly requires such persons to review all matters known or reasonably available to it in preparation for the Rule 30(b)(6) deposition. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial. This would totally defeat the purpose of the discovery process. The Court understands that preparing for a Rule 30(b)(6) deposition can be burdensome. However, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business.

*United States v. Taylor,* 166 F.R.D. 356, 361–62 (M.D.N.C.1996), *accord Paul Revere Life Ins. Co. v. Jafari,* 206 F.R.D. 126, 127–28 (D.Md.2002).

Neither the parties' research nor my own has found any authority directly addressing the specific question of whether a corporation receiving a Rule 30(b)(6) notice is obligated to prepare its witness with both the entity's own knowledge and the knowledge of its subsidiaries and affiliates. However, decisions dealing with the scope of a producing party's duty to respond to interrogatories or document requests provide guidance.

[2] A corporation responding to interrogatories must provide not only the information contained in its own files and possessed by its own employees, *American Rockwool, Inc. v. Owens–Corning Fiberglas Corp.,* 109 F.R.D. 263, 266 (E.D.N.C.1985), it must also provide all information under its control. "A

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)
**(Cite as: 2002 WL 1835439 (S.D.N.Y.))**

party served with interrogatories is obliged to respond by 'furnish[ing] such information *as is available to the party.'* [Defendant] therefore is obliged to respond to the interrogatories not only by providing the information it has, but also the information within its control or otherwise obtainable by it." *In re Auction Houses Antitrust Litig.,* 196 F.R.D. 444, 445 (S.D.N.Y.2000), *quoting and citing* Fed.R.Civ.P. 33(a) (emphasis in original); *Cullins v. Heckler,* 108 F.R.D. 172, 176–77 (S.D.N.Y.1985); 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure: Civil* §§ 2174, 2177 (2d ed.1994). *See also Shamis v. Ambassador Factors Corp.,* 34 F.Supp.2d 879, 894 (S.D.N.Y.1999). Accordingly, "when the parent is served with an interrogatory, it is no defense to claim that the information is within the possession of a wholly owned subsidiary, because such a corporation is owned and controlled by such interrogee." *Westinghouse Credit Corp. v. Mountain States Mining & Milling Co.,* 37 F.R.D. 348, 349 (D.Col.1965). *See also Sol S. Turnoff Drug Distrib. Inc. v. N.V. Nederlandsche Combinatie Voor Chemische Industrie,* 55 F.R.D. 347, 349 (E.D.Pa.1972); *Erone Corp. v. Skouras Theaters Corp.,* 22 F.R.D. 494, 498 (S.D.N.Y.1958); *Greenbie v. Noble,* 18 F.R.D. 414, 415 (S.D.N.Y.1955); *Banana Serv. Co. v. United Fruit Co.,* 15 F.R.D. 106, 108 (D.Mass.1953).

**\*4** The same principle applies to requests for documents pursuant to Rule 34 and requires a party to produce documents in its "possession, custody or control ...." Fed.R.Civ.P. 34(a). As observed by the Honorable Robert W. Sweet, United States District Judge, in *Dietrich v. Bauer,* 95 Civ. 7051(RWS), 2000 WL 1171132 at \*3 (S.D.N.Y. Aug. 16, 2000):

Numerous courts have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-owned subsidiary that it must be deemed to have control over documents located with that subsidiary. *See United States v. International Union of Petroleum and Indus. Workers,*

*AFL–CIO,* 870 F.2d 1450, 1452 (9th Cir.1989) ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls."); *Alden v. Time Warner, Inc.,* No. 94 Civ. 6109, 1995 WL 679238, at \*2 (S.D.N.Y. Nov.14, 1995) (corporate parent required to produce documents held by its subsidiary); *Camden Iron* [& *Metal v. Marubeni Am. Corp.*], 138 F.R.D. [438,] 441 [ (D.N.J.1991) ] (parent corporation has control over documents in physical control of wholly-owned or controlled subsidiary); *In re Uranium Trust Litigation,* 480 F.Supp. 1138, 1152 (N.D.Ill.1979) (corporate parent must produce documents of wholly-owned subsidiary but not documents of 43.8%-owned subsidiary which conducted its corporate affairs separately); *Hubbard v. Rubbermaid, Inc.,* 78 F.R.D. 631, 637 (D.Md.1978) (parent corporation must produce documents held by wholly-owned subsidiaries and fact that subsidiaries were separate corporate entities was irrelevant). This principle applies where the subsidiary is not owned directly but, rather, is owned by an intermediate corporation that is itself a wholly-owned corporation of the parent corporation. *See Lethbridge v. British Aerospace PLC,* No. 89 Civ. 1407, 1990 WL 194915, at \*1 (S.D.N.Y. Nov. 28, 1990).

*See also George Hantscho Co. v. Miehle–Goss–Dexter, Inc.,* 33 F.R.D. 332, 334–35 (S.D.N.Y.1963).

I conclude that the same principle that is applied to interrogatories and document requests should also be applied to determine the scope of a party's obligation in responding to a Rule 30(b)(6) notice of deposition. There is no logical reason why the sources researched by a party in responding to a discovery request should be dependent on the particular discovery vehicle used; in all cases, the responding party should be obligated to produce the information under its control. Application of this principle to Rule 30(b)(6) discovery is not only consistent with the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)
**(Cite as: 2002 WL 1835439 (S.D.N.Y.))**

judicial interpretations of the other discovery provisions of the Federal Rules of Civil Procedure, it is also consistent with the purpose of discovery—"[to] make a trial less a game of blind man's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *accord EEOC v. Metropolitan Museum of Art,* 80 F.R.D. 317, 318 (S.D.N.Y.1978).

**\*5** [3] Application of this principle to the present case leads to the conclusion that Tribune Broadcasting must provide a witness prepared with the knowledge of WGN Superstation to testify concerning the documents in issue. Tribune Broadcasting's public statements establish that it controls WGN Superstation. Specifically, Tribune Broadcasting's web page states "Tribune Broadcasting *owns and operates* 23 major-market television stations, *including national superstation WGN–TV,* and reaches more than 80 percent of U.S. television households." *Tribune Company Overview, available at* http://www.tribune.com/about/index.htm (last visited Aug. 4, 2002) (emphasis added). Since Tribune Broadcasting "owns and operates" WGN Superstation, it has sufficient control to be charged with WGN Superstation's knowledge for discovery purposes.[FN2]

> FN2. Although Tribune Broadcasting has, in response to the current motion, attempted to distance itself both from the statements on its web site and from WGN Superstation, its arguments in this regard are entitled to no weight. There cannot be one "truth" for the world at large, and a different "truth" for the Court.

IV. *Conclusion*

Accordingly, for all the foregoing reasons, I conclude that Tribune Broadcasting violated its obligations under Rule 30(b)(6) by failing to provide a witness properly prepared to testify concerning the subject matters designated in plaintiff's notice of deposition. Accordingly, no later than August 19, 2002, Tribune Broadcasting is directed to produce a witness properly prepared with the knowledge of WGN Superstation concerning all documents produced by Tribune Broadcasting.

SO ORDERED

S.D.N.Y.,2002.
Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.
Not Reported in F.Supp.2d, 2002 WL 1835439 (S.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.